## MILLER v. NEWELL.

1. The Court of Equity could not decree specific performance of an agreement between the plaintiff in a slander case and his attorneys, that he would pay to them a part of his recovery out of the verdict when obtained, or a portion of the verdict itself.

2. If, in such case, the verdict, when obtained, was satisfied through collusion between plaintiff and defendant to the injury of plaintiff's attorneys, the court would not order the satisfaction to be vacated, as specific performance of such agreement between plaintiff and his attorneys could not be decreed.

3. A proceeding by rule, on the motion of plaintiff's attorneys, to require the defendant in such slander case to show cause why a satisfaction of the verdict should not be vacated, is in the nature of a bill for specific performance and cannot be entertained.

4. The attorneys, as creditors of the plaintiff, could not proceed against the defendant for an alleged fraud in the satisfaction, until they had exhausted their legal remedies against their debtor.

5. A chose in action arising out of tort strictly personal, as slander, is not assignable. After verdict in slander, but before judgment entered thereon and while appeal is pending, the claim for damages continues to be a chose in action.

6. An assignment may be made by parol, but doubted whether the mere declaration "I do assign," in the absence of the subject-matter, constitutes an assignment.

7. The facts and circumstances of this case did not give defendant knowledge of the plaintiff's intended fraud upon his attorneys, nor were they sufficient notice to put defendant upon the inquiry. The findings of fact by the Circuit judge on the return to the rule, not concurred in. McGOWAN, A. J., *dissenting.*

Before COTHRAN, J., Anderson, October, 1882.

The order of the Circuit judge, discharging the rule in this case, was as follows:

This is proceeding by rule upon the defendant to show cause why the entry of satisfaction on the sheriff's book of a certain execution in favor of the plaintiff against the defendant, for the sum of $2,000, should not be held to be satisfaction only *pro tanto*—that is to say, to the extent of $1,000, the sum actually paid, besides costs; and the sheriff required to enforce the execution for the balance thereof against the defendant for and on behalf of the plaintiff's attorneys in said cause. The respondent (defendant) made return to the rule, and upon this and certain affidavits in support of it, and upon affidavits submitted in behalf of the actors, the cause came on to be heard by the court at the Fall Term, 1882, for Anderson county.

The following brief history is deemed necessary for a proper understanding of the questions involved: The main cause, which was an action for slander, was tried at the October Term, 1881, of the court, and resulted in a verdict of $2,000 for the plaintiff. The defendant's counsel moved upon the minutes of the presiding judge for a new trial, which was argued and refused

during that term of the court, to which refusal the defendant, by his counsel, excepted. Within ten days the defendant's counsel served upon the plaintiff's counsel their notice and grounds of appeal, addressed only to the plaintiff's counsel—no copy of which was served upon the presiding judge within thirty days from the service of that notice, to wit, on November 22d. By means of the intervention and efforts of "mutual friends," and with the aid of the senior counsel of the defendant, who prepared the papers, but who had no further participation in the matter or knowledge of the negotiations, the defendant and the plaintiff effected a settlement of the controversy between them by the former paying to the latter the sum of $1,000, in full discharge and satisfaction of the said verdict. It was agreed at the time, and by all the parties to this settlement, and by those who were present, excepting J. B. Watson, who did not so understand it, as he says, that this settlement was to be kept secret from that day, Tuesday, November 22d, until Saturday, November 26th. On the day last mentioned, the defendant's counsel served upon the plaintiff's counsel a written notice, stating that the matter in controversy between plaintiff and defendant had been adjusted and settled by them ; that no judgment or execution should be entered upon said verdict, or any portion of it, and that the whole case should be discontinued.

On November 30th the counsel for the plaintiff procured an order from the clerk of the Supreme Court dismissing the appeal in the cause, for failure on the part of the appellant to serve the presiding judge with notice of the appeal and grounds, and for failure to file the return with the clerk of the Supreme Court within the time required by law. On December 2d, judgment was entered up by plaintiff's counsel upon the verdict and execution lodged with the sheriff; and on January 9th following, the defendant, by advice of his counsel, paid to the sheriff the taxed costs of the case, and produced the plaintiff's receipt, purporting to be in full satisfaction of his entire claim, which was duly entered on the execution, or upon the execution book of the sheriff. In the meantime—that is to say, between November 22d and 26th, 1881, the plaintiff Miller fled from the State, and has not since returned. At the next term of the court the actors

herein applied for and obtained the rule which, with the return thereto and the various affidavits in the cause, are now under consideration.

The issues involved are both difficult and delicate, but they may be justly determined by answering correctly the three following questions: 1. Was there any appeal pending in the cause on November 22d, 1881? 2. Was there such an assignment by the plaintiff to Orr, Wells & Allen of one-half of the recovery of $2,000; or such an agreement to pay them that sum out of the recovery, as to give them an enforcible lien for the same? 3. Was there such actual notice given to the defendant of this assignment or agreement; or did he have such knowledge of facts concerning it as should have put a reasonable man upon inquiry, whereby, in disregarding the one or failing to follow up the other, he has become legally liable for actively or negligently causing the actors here to lose their debt?

First—as to the appeal pending. After some possible contrariety of decision in the batch of cases reported in 12 *S. C. R.*, beginning with *Rogers & Nash, p.* 559, and *Sullivan & Speights, p.* 561, and *Lake & Moore, p.* 563, with the case of *Coleman* v. *Heller*, 13 *S. C.* 491, the true rule seems to be adducible from the case last cited, and is, that the first section of the act of 1878, 16 *Stat.* 698, was only meant to cover the case where no exceptions were taken at the time. If they were so taken, then service of copy of exceptions under the act, was unnecessary. Did the defendant at the time except to the rulings of the presiding judge? To make objections sufficient to sustain an appeal, it is not necessary that the word exceptions should be used; the better practice undoubtedly is, to give the court information at the time the party excepts, and have it noted on the record, so that there can be no misunderstanding about it; but it has been held that when it appears from the record that the judge was apprised of the intention to rely on the propositions advanced by way of exception, that is sufficient to constitute an exception, though there is no formal request to note an exception. *Many cases cited.* Continuing, the court says: "Here the propositions by way of exception were positive and unmistakable.  *  \*  \* * We think it appears from the

record that the judge was apprised of the intention to rely on the propositions advanced by way of exception, and that is sufficient to constitute án exception, although there was no formal request to note an exception." The motion to dismiss the appeal was refused.

Here no exception by the defendant's counsel appears upon the record nor upon the calendar, where the notice of motion on the minutes is entered ; but it is admitted that the motion was made, that it was refused, and that the defendant's counsel excepted. The grounds of exception, as afterward served upon plaintiff's counsel, but not upon the presiding judge, are, in substance, as follows : 1. For excessive damages. 2. For admitting incompetent testimony. 3. For excluding explanatory testimony. 4. For a variance between the *allegata* and *probata*. 5. For refusing to grant a non-suit. True, it does not satisfactorily appear that these propositions were " advanced by way of exception," at the time the motion was made and refused. It is more probable that they were enlarged when afterwards formulated and served upon the plaintiff's attorneys within ten days after the refusal of the motion.

The question, however, as to the appeal pending in the cause is, in my opinion, incidental and collateral, and only material to the inquiry here, as furnishing reasonable inducement to the alleged compromise. Its only value is in aid of motive, and the belief of the fact by the defendant's counsel, as shown by his affidavit, and the deposition of J. C. Milford, that pending the negotiations the defendant, Newell, said he would not give $1,400 to compromise—" that he would take the case to the Supreme Court first,"—satisfy me that both counsel and client believed that the appeal was pending, and whether it was technically so in fact or not was not material.

Second. As to the assignment and lien, and first as to the lien. An attorney's lien, as now generally recognized, is of two kinds : The one a general lien upon the papers in his hands belonging to his client, which is a mere right to retain until his bill is paid ; all deeds, vouchers, &c., upon which, or in connection with which, he has rendered professional services, or made disbursements in the cause. It confers no active right; it is passive,

enabling the attorney to hold for whatever may be due to him, and although dismissed from the cause, if without fault on his part, he may retain the papers in his possession until his professional services and disbursements are paid and refunded. *In re Paschal*, 10 *Wall.* 483; *Ex parte Nesbit*, 2 *Sch. & Lef.* 279; *Ex parte Sterling*, 16 *Ves.* 258; *Cross on Lien, p.* 216, *ch. XV.*, *passim.*

The other kind of lien is that which an attorney has upon a judgment recorded or money payable thereon, or upon a fund in court. This is not merely passive, but authorizes the taking of active steps. It did not exist at common law. In 1 *Douglass* 104, it is said by Lord Mansfield not to be very ancient. It is founded upon the first rule of *ex œquo et bono*, and is invoked by the courts for the protection of attorneys, as its own officers, by taking care that a "party should not run away with the fruits of the cause, without satisfying the legal demands of the attorney by whose industry and, in many cases, by whose expense those fruits are obtained." *Read* v. *Dupper*, 6 *T. R.* 361. It is true that Lord Kenyon in this case makes the validity of the payment depend upon the *bona fides* with which it was made—that is to say, upon the absence of notice or knowledge on the defendant's part of the claim of the plaintiff's attorney; and this, I take it, is the main inquiry in this case, which will be considered hereafter.

This lien, from its very nature, is equitable, and not legal. It is bottomed upon the equitable consideration that by the attorney's skill and labor the judgment has been recovered, which being within the control of the court, and the parties to it within its jurisdiction, the court will see that no injustice is done to its own officers. The very recent New York decisions sustain this doctrine to its utmost limits, under the provisions of the new code (1879), which have extended this lien to any deserved or agreed compensation, to be recovered upon a *quantum meruit*, or by enforcing the express agreement. I do not understand by the provisions of our code that such lien extends beyond the taxable costs and disbursements, and the rule laid down in *Scharlock* v. *Oland*, 1 *Rich.* 207, is still the law in this State.

Was there a contract of assignment between the plaintiff,

Miller, and his attorneys of one-half the damages recovered by the verdict, or a mere agreement by which they should have from him one-half of the same upon its recovery? Whichever it was, it rests altogether in parol, and, in the view which I take of the case, it is not as vital a question as counsel seemed to regard it in the argument. If it was an assignment by the plaintiff, without the knowledge of the fact by the defendant, or of such facts in relation to it as should have put him upon inquiry, and he, in good faith, satisfied the plaintiff's demand, he would be entitled to the protection of the court, except as to the matter of costs and disbursements.

If it was an agreement by which the plaintiff was to pay his attorneys one-half of the verdict, and the defendant had no knowledge of such agreement, or of such facts in relation to it as should have put him upon inquiry, and he, in good faith, satisfied the plaintiff's demand, he would in like manner be entitled to the protection of the court except as to the matter of costs and disbursements. But under the principle laid down in the case of *Lowry* v. *Pinson,* 2 *Bail.* 324, if the payment was made to the plaintiff, with knowledge either of the assignment or agreement, and the defendant thereby intentionally enabled the plaintiff to defeat the claim of his attorneys, such payment cannot be sanctioned by the court beyond the number of dollars actually paid, and as an attempt to satisfy the whole demand it is vain and futile. The law upholds assignments of and agreements in relation to personal property by parol. *Howell* v. *Bulkley,* 1 *Nott. & McC.,* 249; *Briggs* v. *Dorr,* 19 *Johns.* 95.

The proof, however, satisfies me that this was an assignment. The deposition of John E. Allen, an honorable counselor, is distinct and positive upon this point. He says (paragraph IV. of his affidavit), "that said plaintiff, after the said notice of appeal, assigned by parol one-half of said verdict to his said attorneys for their compensation in said trial," &c. He was one of the active parties to the contract of assignment—the other party to it, Miller, has run away with the fruits of the cause; and although others have alluded in their depositions to this matter as an agreement, repeating the alleged declarations of the

plaintiff, Miller, I am constrained to hold that there was an assignment of one-half of the verdict, and not a mere agreement to pay that sum.

I have now to consider the last and most important inquiry in the case: Did the defendant have knowledge of the assigned claim of these parties, or knowledge of such facts in relation to it as should have put them upon inquiry? After a careful review of the testimony, and the circumstances of this transaction, I am constrained to hold, in the language of Mr. Justice Bradley in *In re Paschal*, 10 *Wall.* 495; "that the defendant could not safely settle with the plaintiff, without paying" this claim. I am much impressed by the nature of this transaction, and the circumstances attending it—the long and bitter controversy between the parties, their hostile attitude towards each other, the protracted negotiations by "mutual friends," chief amongst whom was J. C. Milford, evidently more the friend of the defendant than of the plaintiff; his reluctant appearance before the master, being brought up by subpœna; his gingerly deposition; the proof by Walters that defendant asked him to see the plaintiff, and ascertain if the matter could be compromised and settled, that he wanted Miller to get the benefit of what was paid in the compromise; could arrange it without going to town, &c. What possible benefit was contemplated here, save to the prejudice or injury of another? Why give the benefit of what was paid to Miller? They were more than at arms-length; they were not in speaking distance of each other; they were enemies. The strange coincidence, too, of paying to Miller exactly the amount that he was entitled to under the assignment; and, more than all, the four days of secrecy imposed—secrecy so significant of the end accomplished, so readily acquiesced in, and so faithfully observed. Secrecy, from the time of Lord Coke, who denounced it as 'a mark of fraud,' down to the present day, is that detestable thing which courts of justice despise. Secrecy is a badge of fraud, because it tends to deceive creditors, and is not in the course in which honest men ordinarily transact business. *Dona clandestina sunt suspiciosa.* The secrecy which constitutes a badge of fraud, is not a mere want of notoriety, but a concealment, or an attempted concealment." *Big. Fraud* 81.

From these considerations, I hold that this transaction was fraudulent, and my conclusion may be well stated in the words of the learned judge who delivered the opinion of the court in the justly celebrated case of *Lowry* v. *Pinson, supra:* "There is perhaps no principle of more universal application than that fraud avoids all contracts between parties themselves if one imposes on the other, and between them and third parties where they conspire to defraud others. And cases might arise where they could as readily be effected, where a full and fair price is paid. One rich in lands, houses, or other permanent property, resolves not to pay his debts, and another, knowing this, treats with him, and purchases his whole estate at a fair and full price, and thus enables him to fly from the claims of his creditors. Now, although the purchaser has gained no advantage, he has enabled the debtor to evade the payment of his debts, and the effect upon the creditor is precisely the same as if nothing had been paid." The case at bar is stronger, for the defendant, Newell, would gain an advantage in being discharged from the payment of one-half of the verdict against him, and has enabled the plaintiff, Miller, to fly from the just claim of his creditors.

The conclusion thus attained, might find just and valuable support in considering the relation between the defendant and J. C. Milford, the mutual friend or agent, through whose active intervention, at the request of the defendant, those negotiations were carried on and consummated. Milford deposes that Miller said to him (in the very midst of the negotiations), that " he had agreed to give his attorneys a certain per cent. of the amount recovered, and if it was known that he was going to make a compromise, his lawyers would not let him make the compromise." " It is not essential that notice be given to the party himself, but notice to his counsel, solicitor or agent is sufficient, whether given in the same or in another transaction, provided there be adequate reasons to conclude that the facts continued in remembrance." *Ad. Eq.* 157. Can it be conceived that this matter, which was the very gist of the settlement, and the direct cause of, and reason for, the imposition of the desire of secrecy, should not have continued in "the remembrance of the

agent," even if they were not in fact communicated to the principal. I hold not.

It is, therefore, ordered, adjudged and decreed: First. That the rule herein be and the same is hereby made absolute. Second. That the alleged satisfaction or receipt given by W. B. Miller, the plaintiff, to Newton J. Newell, the defendant, and entered in the sheriff's book as satisfaction of said judgment and execution be and the same is hereby held to be satisfaction only *pro tanto;* and that the sheriff for Anderson county do enforce the said execution against the said defendant for the balance due thereon, according to the force, form and effect of said judgment and execution for, and in behalf of, the plaintiff's attorneys in the said cause, who are the actors in this proceeding.

From this judgment, the defendant appealed.

*Messrs. Murray & Murray,* for appellant.

*Messrs. J. L. Tribble* and *Joseph N. Brown,* contra.

October 25th, 1883. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The plaintiff, Miller, brought action against the defendant, Newell, for slander, and recovered a verdict for $2,000. The defendant moved upon the minutes of the court for a new trial, which being refused, defendant excepted, and, within ten days after the rising of the court, served upon plaintiff's· counsel notice of his intention to appeal, also his grounds of appeal. No copy of this notice and grounds of appeal was served on the presiding judge.

The verdict was obtained at the October Term of the court at Anderson in 1881. A short time after the notice of appeal had been served, to wit, on November 22d, 1881, the parties, plaintiff and defendant, at the instance of and through mutual friends, as it is said, effected a settlement of the controversy between them by the defendant paying to plaintiff $1,000 in full discharge and satisfaction of the verdict, which sum being paid, a receipt and discharge under seal was executed by the plaintiff, in which it

was stated to be in full of all claim against the defendant, except defendant's costs; and further, that no judgment or execution upon the verdict for $2,000, or any part thereof, should be entered.

On November 26th, notice of this settlement was served by defendant's counsel upon the plaintiff's counsel. On November 30th, which was after the settlement, plaintiff's counsel procured an order from the clerk of the Supreme dismissing the appeal for failure on the part of the appellant to serve the judge with the notice and grounds of appeal within the required time. On December 2d, 1881, plaintiff's counsel entered judgment upon the verdict and lodged execution with the sheriff. Within a few days thereafter the defendant paid the tax costs of the case, and produced plaintiff's receipt in full of the verdict, which receipt was duly entered on the execution. In the meantime the plaintiff had fled the State, as is stated, and has not since returned.

At the next term of the court the plaintiff's attorneys upon affidavits applied for a rule against the defendant to show cause why the entry of satisfaction, which had been made on the execution by virtue of plaintiff's receipt and discharge, should not be held as satisfaction only to the extent of the amount paid, to wit, $1,000 and the costs, and the sheriff be required to enforce the execution for the balance thereof. This rule was applied for on the ground, as appeared in the affidavit of one of plaintiff's counsel, that said plaintiff, when he employed his counsel, in addition to a retaining fee promised as further compensation to assign one-half of the recovery in the case to them, and that after the verdict and notice of appeal the plaintiff had, by parol, assigned one-half of said verdict to said attorneys for past services in said case, and also for additional services to be rendered in the appeal; that these facts were known to the defendant, or at least that he had sufficient information to put him on the inquiry, yet, notwithstanding this, that he procured his attorney, J. S. Murray, Esq., to draw up the agreement and discharge, and had it consummated in fraud of the rights of said attorneys.

In answer to the rule, the defendant, Newell, denied unqualifiedly the charges upon which the rule had been issued—denied all knowledge of the alleged agreement as to the fees of plaint-

iff's counsel or the assignment of the verdict, and repudiated the charge that it was his purpose in making the settlement to defraud said counsel. On the contrary, that knowing no one in the transaction but the plaintiff, he made the settlement because he had the right to do so, as he thought, and because he believed it was the best thing for him under the circumstances.

The rule and answer with the affidavits for and against were heard by Judge Cothran, at the October Term, 1882, who, regarding the following to be the issues involved, discussed and passed judgment thereon : " 1. Was there any appeal pending in the cause on November 22d, 1881 ? 2. Was there such an assignment by the plaintiff to Orr, Wells & Allen of one-half of the recovery of $2,000 ; or such an agreement to pay that sum out of the recovery as to give them an enforceable lien for the same ? 3. Was there such actual notice given to the defendant of this assignment or agreement ; or did he have such knowledge of facts concerning it as should have put a reasonable man upon inquiry, whereby, in disregarding the one or failing to follow the other, he has become legally liable for actively or negligently causing the actors to lose their debt ? "

As to the first question, to wit, the pendency of the appeal at the time the settlement was made of the verdict, his Honor reached the conclusion that both counsel and client believed that the appeal was pending, and whether it was technically so, in fact, was not material. This appeal does not involve the correctness of this conclusion, so that this question may be dismissed from our consideration. As to the other two questions, his Honor found that an assignment of the verdict had been made by plaintiff to his attorneys before the settlement ; that the defendant had knowledge thereof, and that the transaction was fraudulent. He therefore made the rule absolute.

The defendant has appealed upon the following grounds :

1. " Because his Honor erred in holding that the right of recovery in this case, which was grounded on a tort, could, in law, be assigned before judgment entered and during an appeal to the Supreme Court.

2. " Because his Honor erred in holding that a verdict pend-

ing an appeal to the Supreme Court, upon which no judgment had entered, could be assigned by parol alone.

3. " Because his Honor erred in holding that an agreement to pay the plaintiff's attorneys a part of the recovery gave them an enforceable lien.

4. " Because his Honor erred in decreeing that there was an assignment for half of the verdict, when the proof shows that if there was an assignment it was conditioned to secure services of counsel in the pending litigation in the Supreme Court, and being for these services, which were not rendered, was certainly invalid for a part of the sum pretended to be assigned.

5. " Because his Honor erred in holding that Newell's secrecy for four days as to a fact which the law did not require to be published, was a fraud, and at the same time holding that the plaintiff's failure to make known his assignment, which the law required to be made known or recorded to bind the parties, was valid and gave them an enforceable lien.

6. " Because his Honor erred in holding J. C. Milford to be an agent of Newell.

7. " Because his Honor erred in holding that Newell had notice when it is nowhere proved by the testimony.

8. " Because his Honor erred in holding that Newell had such notice as to make him responsible.

9. " Because his Honor erred in holding that the settlement in this case was attended with such suspicious circumstances as to charge Newell with fraud.

10. " Because his Honor erred in holding that J. C. Milford was a reluctant witness, when there is not a *scintilla* of proof as to such fact.

11. " Because his Honor erred in holding that Newell would gain an advantage in the compromise, thereby deciding against Newell without any hearing of the case pending in the Supreme Court at the time the compromise was made."

The Circuit judge bases his judgment upon two legal propositions, under one or both of which he thought the facts brought the case. These propositions are—First. If there was an assignment by the plaintiff without the knowledge of the defendant, or of such facts in relation to it as should have put him upon

inquiry, and he, in good faith, satisfied the plaintiff's demand, then he should be protected by the court, except as to the matter of costs. Second. If there was an agreement by which the plaintiff was to pay his attorneys one-half of the verdict, and the defendant had no knowledge of such agreement, or of such facts in relation to it as should have put him upon inquiry, and he, in good faith, satisfied the plaintiff's demand, he would, in like manner, be entitled to the protection of the court, except as to the matter of costs and disbursements. The converse of both propositions being that if the defendant had the knowledge, &c., he should not be protected.

No doubt both of these propositions are sound. They are not only founded in natural justice, but they are fully sustained by authority. The question is, do the facts of this case bring it under either one of them; and, if so, can the actors invoke their application in this proceeding of a rule to show cause?

On this point we will take up the second proposition first. Suppose that there was an agreement, and nothing more than an agreement, between Miller and his attorneys that they should be paid one-half of the recovery in the slander case, either out of the verdict when collected, or that the verdict should be assigned to them to that extent, and Miller, at the close of the case, had refused to comply, what would have been the remedy for the counsel? Could they have gone into the Court of Equity for a specific enforcement? We think not, as this agreement was not one of a character which entitles parties to specific performance. It was not an agreement in reference to land, nor in reference to a jewel, an heir-loom or family relic, or anything else having an artificial value on account of which the old Court of Equity would decree specific performance. Nor was it an agreement the breach of which could not be compensated in damages. The only remedy in reach of the counsel would have been an action for breach of contract.

Now, admit that there was collusion between Miller and Newell to breach this contract to the injury of the attorneys by marking the verdict satisfied on the payment of the $1,000, which was paid. This would be a fraud, and a gross one; but would this fraud give the attorneys the right to go into equity to

have the entry of satisfaction vacated so that they might ask a specific performance of the agreement? Certainly not, if, after having vacated the entry, the case was found to be one in which the court could not decree a specific performance. It would be idle to declare the entry of satisfaction a nullity when the court could proceed no further. The verdict would still be Miller's, and the court would have no power to decree that the attorneys should be paid out of it, or that one-half thereof should be assigned to them, because attorneys in this State have no enforceable lien for their fees resting alone in contract., *Scharlock* v. *Oland,* 1 *Rich.* 207. Courts do not sit simply to adjudge acts fraudulent. They are not public censors organized simply to censure vice and to mark immorality, but it is their end in part to afford relief and redress to. the consequences of such acts. Where, then, such relief is sought as the court can give for a fraudulent act, then the court can take cognizance. But where the court can give no relief, however fraudulent the act may be, the court is without jurisdiction.

Now, this rule, so far as it proceeds upon the alleged agreement of Miller that his counsel should be paid out of the verdict, or that one-half of it should be assigned to them, is in the nature of a bill for specific performance against Miller by his attorneys, and yet Miller is no party. Such a proceeding, as we have seen, could not have been entertained in equity by bill against Miller himself, and, consequently, we think, could not be entertained here by rule.

It may be contended, however, that while this is true, yet that the attorneys were creditors of Miller, and this collusion between him and Newell was a fraud intended to delay and hinder them in the collection of their debt, and under the rule of *Lowry* v. *Pinson,* 2 *Bail.* 324, and numerous other cases to the same point, that the settlement of this verdict should be set aside. The principle is well established, that where a debtor disposes of his property, even for a valuable and full consideration, yet for the purpose of defeating, delaying or hindering one or more of his creditors, the act of disposition is fraudulent, because not *bona fide,* and may be vacated in behalf of the creditor; but before this can be done there are certain steps for the creditor to take.

He must have his claim against the debtor adjudicated and established, and he must then exhaust the other property of the debtor. A debtor has a right to dispose of a portion of his property so that he leaves enough for his creditors. The act is not fraudulent unless it results in injury to some one. Where a debtor disposes of his property, a creditor, who feels that he has been injured, after establishing his demand to judgment and failing to find other property of the debtor sufficient to satisfy his debt, may then move to set aside the conveyance which, in his judgment, is fraudulent, but not before.

Now, here, Miller, in effect, transferred to Newell a portion of his claim of $2,000, supposing it to be a valid claim, which he had a right to do, but not to the prejudice of his creditors. The court will not, however, assume that one man is the creditor of another, or that he has been prejudiced by the transfer of property by the alleged debtor. These facts must be proved. In other words, the creditor must obtain judgment on his claim, and show in some way that all of the other property of the debtor has been exhausted, and that it is necessary for him to resort to the property thus disposed of, so that his claim may be paid. These facts did not appear in this case, and we are of opinion, therefore, that the second proposition of law mentioned above could not be invoked for the actors in the rule.

Next, there is no doubt, as we have already said, of the correctness of the first proposition. But did the facts of the case make it applicable? Was there a valid assignment, and did the defendant have knowledge of this assignment, or of facts sufficient to put him upon inquiry? These involve both questions of fact and of law. As to what occurred, I mean the facts as proved, there is no dispute, especially in reference to the assignment. The testimony on that subject appears in the affidavit of Mr. Allen, one of Miller's attorneys. He states that when the attorneys were employed, Miller promised, " as a further compensation beyond the retaining fee, to assign to them one-half of the recovery," and also, that after the verdict and notice of appeal Miller did assign by parol one-half of said verdict to said attorneys. He does not state how this assignment was made, except

that it was by parol, but whether there was any delivery of the verdict, actual or symbolical, does not appear.

Now assuming that these facts occurred as stated by Mr. Allen, the questions of law arise, could this verdict in its then shape, being a verdict for damages in an action of tort to the character of Miller, with an appeal pending, be made the subject of assignment? and, if so, whether a statement by a witness that it had been "assigned by parol," without stating the circumstances of delivery, actual or symbolical, is sufficient evidence of an assignment? It will not be necessary to trace the law of assignments of choses in action back to its original source, or to discuss the various modifications and enlargements of this doctrine, which have subsequently taken place under the demands of commerce and trade. It is sufficient to say that nearly all choses in action founded on contract may be assigned, whether they be notes negotiable or unnegotiable—bonds, judgments, decrees, or evidenced in any other way, and they may be assigned either in writing without seal or under seal or by verbal parol. But it is not necessary to pursue this discussion, as the matter involved here is not a chose in action arising on contract. On the contrary it is a chose in action arising in tort. It may be called a chose in action, as those terms taken in their broadest latitude comprehend not only a demand arising on contract, but also a wrong or injury done to person or property. *People* v. *Tioga C. P.*, 19 *Wend.* 75.

Can choses in action on torts be assigned? Torts, in their effects, may be divided into two classes, to wit: those which affect injuriously the estate, real or personal, of a party, and those which cause injuries strictly personal; those which survive to the administrator and those which die with the party injured. It appears that those which affect the estate may be assigned, but those of a personal character cannot. Neither can a contract, in which the personal acts and qualities of one of the contracting parties form a material ingredient, in general be assigned. 2 *Chit. Cont.* 1364. In reference to torts, Mr. Chitty says: "A distinction has, however, been taken between different classes of torts—those which cause injuries strictly personal being regarded as furnishing no assignable claim for damages; while the con-

trary is held as to those from which special loss has arisen to the estate of the assignor." *Gardner* v. *Adams*, 12 *Wend.* 297 ; 2 *Story Eq. Jur.*, § 1040, *g; Comegys* v. *Vasse*, 1 *Pet.* 193 ; *People* v. *Tioga C. P.*, 19 *Wend.* 75 ; *McKee* v. *Judd*, 2 *Kernan* 625–6.
. Now was the matter involved here a chose in action arising in tort of a strictly personal character ?　It was an action at the beginning for slander.　This was certainly of a personal nature entirely and strictly, and it arose in a tort.　Has its character changed in the progress of the suit ?　Has it passed beyond the condition of a chose in action, and become an adjudicated right to so much money—evidenced by a judgment, which in some sense might be regarded as a contract and therefore assignable. It is very certain that no judgment had been entered, when the alleged assignment was made.　But had Miller the right to enter an unalterable judgment at that time ?　Had the amount of his damages become an established and an accomplished fact ?　This must depend upon the further fact, was the appeal pending ? The Circuit judge did not pass upon this question definitely.　He seemed, however, to be under the impression that it was pending. In this we concur.　We think that *Coleman* v. *Heller*, 13 *S. C.* 491, is conclusive of the question.　Under this case the appeal was pending, and such being the case the rights of the parties had not been determined.　The matter was still a chose in action arising on tort of a strictly personal character and therefore not assignable.

We find in *Bliss Code Pl.*, § 38, the following :　"That not even in equity was an assignment allowed of a right of action arising from a mere personal wrong, as libel, slander and injuries to the person.　The injury must be to the estate, otherwise there is nothing assigned.　A mere personal wrong will entitle the sufferer to redress, but his right to redress is not deemed property so as to survive."　Again, at section 44, he says :　"A judgment, upon whatever founded, is everywhere regarded as a debt which does not abate by death, and which is transferable like an ordinary contract.　But the character of the demand is not changed until judgment, and an action based on a cause of action which would not survive will abate by death during any step of the proceeding, and the demand cannot be assigned after verdict

merely," citing *Crouch* v. *Gridley,* 6 *Hill* (*N. Y.*) 250; *Charles, in re,* 14 *East* 197; *Kellogg* v. *Schuyler,* 2 *Den.* 73.

We might stop here, as this disposes of the case. It would be more satisfactory, however, to discuss the other questions. Was there a legal assignment of the verdict?—admitting it to be assignable. The only testimony upon this subject is found in the affidavit of Mr. Allen. He says, that after the notice of appeal the plaintiff "assigned by parol." We have already seen that an assignment may be made by parol, that it need not be in writing. But it is not certain that a mere verbal declaration that "I do assign," without more and without the matter assigned being present and without delivery, will amount to an assignment. Mr. Chitty says: "That it is now established that no particular form is necessary in equity to constitute an assignment of a debt or chose in action; any order, writing or act which makes an appropriation of a fund, amounts to an equitable assignment of that fund. An assignment of a debt may be made by parol as well as by deed. And where an assignment has been executed by a delivery of the evidence of the contract, no writing is necessary to its validity. If the case is such that an actual delivery cannot be made, a symbolical delivery seems to be sufficient. An equitable assignment of a judgment may be made by parol; and a delivery of the execution is a sufficient symbolical delivery of the judgment on which it issued." 2 *Chit. Cont.* 1365–6. Mr. Allen, however, says that there was an assignment, and although he does not detail the circumstances or state the manner in which it took place, the Circuit judge was perhaps warranted in inferring that the requisite formalities were observed.

Next, was this assignment brought home to Newell, or was he in possession of such facts as should have put him on the inquiry? There is no dispute or controversy as to what the different witnesses testified, and the question at issue must be determined by inferences drawn from the testimony given. There is no positive testimony that Newell was ever distinctly informed of the assignment before or up to the compromise. The facts from which it is said this knowledge must be inferred are three: 1. Walters, one of the witnesses, said that Newell asked him to

see the plaintiff and ascertain if the matter could be com-
promised; that he wanted Miller to get the benefit of what was
paid in the compromise. 2. That when the settlement took
place Miller stated that he desired the compromise kept secret
until the Saturday following, three days; and 3. That Milford,
one of the parties negotiating the compromise, was informed by
Miller that the reason he wanted the matter kept secret was that
he had paid Captain Allen about $200, and had agreed to give
his attorneys a certain per cent. of the amount recovered, and if
it was known that he was going to make a compromise, his law-
yer would not let him make it.

Now according to the testimony no one knew of the fact of
the assignment but Miller and Mr. Allen. Even Mr. Tribble,
one of Miller's attorneys, does not appear to have known it, be-
cause he states that some time about November 1st, 1881, (this
was after the verdict,) Miller informed him that Messrs. Orr,
Wells & Allen were to be paid for their services out of the
judgment, that this was the agreement with them." He does
not state that anything was said about the assignment. So it
appears that no one positively knew of the fact of the assign-
ment but Miller and Mr. Allen; or rather, it does not appear
from the testimony that any except these two knew of it. There
was certainly no notice given to Newell or to his attorneys.
Under these circumstances can it be legitimately inferred from
the facts stated above that Newell had the information? We
think not.

The matter that excites some suspicion was the fact that the
compromise was to be kept secret. That proposition, however,
came from Miller. Newell does not seem to have been at all
concerned whether it was to be kept secret three days or not.
Miller desired it, and Newell made no objection.

But it is said that Milford knew it, and that he was the agent
or friend of Newell. It does not satisfactorily appear that Mil-
ford was the agent of Newell. He did bear a message in the
first instance to Miller from Newell to know if he, Miller,
would compromise. Miller refused and the matter was dropped.
Afterwards, in conversation with Miller, he said he would com-
promise for $1,400. This Milford reported to Newell, who de-

.clined it, but said he would give $1,000. This Miller agreed to take, saying that he would take it provided it was kept secret until Saturday, or at least he is certain that this was said the day the compromise took place; and during this conversation Miller gave the reason why he wanted the matter kept secret. Milford does not say that he informed Newell of this conversation. We do not see such agency here as that Newell was bound to know all that Milford knew. Newell had not constituted Milford his agent to compromise the case, but in reply to propositions from Miller of $1,400, he returned a message that he would give $1,000, and received one in reply, that it would be accepted.

These facts, without regard to the opposing testimony, seem to us altogether insufficient to warrant the inference that Newell knew of the assignment, nor were they enough to put him on the inquiry. The first duty of the assignee, after the assignment was executed, was to give notice to the debtor, if he desired to cut off any dealings between said debtor and the assignor; but here there was no notice, nor was there any indorsement made on the verdict or the judgment by which Newell could have obtained notice. The fact that Miller wished to keep the settlement secret for three days was hardly sufficient to make Newell infer that Miller was attempting to cheat and defraud his attorneys. The character of Miller had just been vindicated by the country to the cost of Newell, and no doubt he was unwilling to interfere with that character further.

While these facts seem to be insufficient in themselves to support the inference drawn by the Circuit judge when considered alone, this insufficiency is much stronger when they are considered in connection with the opposing testimony, to wit, the affidavit of Newell. He denies most positively and emphatically that he knew anything whatever of the arrangement made by Miller to pay his attorney's fee, or that there was any collusion between himself and Miller to defraud said attorneys, and states that he did not know that Miller owed said attorneys anything. Newell stands unimpeached before the court. True, he was a party and his testimony was in his own favor, but this is not sufficient to destroy the credit of a man whose character is unimpeachable. With this positive testimony of Newell, met only

by the circumstances which we have already discussed, we are unable to concur with the Circuit judge in his finding of fact as to this point.

No doubt the attorneys of Miller rendered valuable service to him. No doubt they are entitled to the compensation which they demand, and no doubt their client has perpetrated upon them a gross and most ungrateful fraud; and while our sympathies and feelings, so far as we are entitled to indulge sympathy as individuals, are all with the attorneys in this case, yet as a court, solemnly adjudicating the rights of parties, we must be governed by the law and the facts as we understand them.

It is the judgment of this court that the judgment of the Circuit judge be reversed, and that the rule should be discharged.

MR. JUSTICE MCIVER concurred.

MR. JUSTICE MCGOWAN. I incline to think that there was enough to put Newell on the inquiry as to the intended fraud, but in other respects concur.